**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

ECB USA, INC., a Florida corporation, and
ATLANTIC VENTURES CORP., a Florida
Corporation,

       Plaintiffs,                                  Case No.

vs.

SAVENCIA CHEESE USA, LLC, a Delaware
limited liability company, ALEX BONGRAIN, an
individual, J. M. WILD, an individual, LEWIS
GITLIN, an individual, PIERRE RAGNET, an
individual, and TOM SWARTELE, an individual,

       Defendants.

_____/

## COMPLAINT

Plaintiffs ECB USA, INC. ("ECB USA"), and Atlantic Ventures Corp. ("Atlantic Ventures") (ECB USA and Atlantic Ventures may be referred to, collectively, as the "Plaintiffs"), hereby sue defendants Savencia Cheese USA, LLC, ("Savencia Cheese"), Alex Bongrain ("Bongrain"), J.M. Wild ("Wild"), Lewis Gitlin ("Gitlin"), Pierre Ragnet ("Ragnet"), and Tom Swartele ("Swartele") (Savencia Cheese, Bongrain, Wild, Gitlin, Ragnet, and Swartele may be referred to, collectively, as the "Bongrain Defendants").  As grounds, Plaintiffs state as follows:

## NATURE OF THE CASE

The Bongrain Defendants, together with other persons, committed a series of criminal acts, including mail fraud, wire fraud, and transportation of stolen money across state lines for the purpose of looting Schratter Foods Incorporated ("Schratter") and then selling its nearly worthless shell to Plaintiffs.  In order to perpetrate this fraud, the Bongrain Defendants, *inter alia*, falsely stated to representatives of SARL Ets. Claude Blandin & Fils ("ECB") and the yet-to-be-formed

Plaintiffs (the "ECB Representatives") that Alain Voss ("Voss") was Schratter's president and chief executive officer, and the indispensable and trusted leader of Schratter's management team.

Knowing that the ECB Representatives had no experience with cheese and dairy products, and were not eligible to work in the United States, the Bongrain Defendants induced the ECB Representatives to enter a fiduciary relationship with the Bongrain Defendants' co-conspirator, Voss, and to partner with him in the purchase of Schratter, which is exactly what the ECB Representatives did. The ECB Representatives, and ultimately Plaintiffs, put their trust and confidence in Voss, who, in turn, colluded with the Bongrain Defendants in the commission of frauds and other criminal acts.

The Bongrain Defendants, together with Voss and others, fraudulently induced Plaintiffs to purchase Schratter, pay an affiliate of the Bongrain Defendants $17 million toward the purchase price of Schratter, and fund Schratter's operations. The final stage of the Bongrain Defendants' criminal conspiracy was to force Schratter out of business through fraudulent and anti-competitive actions. The Bongrain Defendants bilked Plaintiffs out of approximately $100 million. As a result of the Bongrain Defendants' illegal acts, Plaintiffs seek, *inter alia,* damages in excess of $100 million, including treble damages and punitive damages.

## JURISDICTION AND VENUE

1.      Subject matter jurisdiction is proper because a substantial part of this action arises under 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court…." Jurisdiction is also proper under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Finally, jurisdiction is proper pursuant to 28

U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship among the parties.

2.      Personal jurisdiction over each of the Bongrain Defendants is proper in the Southern District of Florida under Sections 48.193(1)(a)(2) and (6), Florida Statutes.   As more fully set forth, *infra*: (i) each of the Bongrain Defendants committed torts and caused injury within the State of Florida, and (ii) Savencia Cheese's products were used and consumed within the State of Florida in the ordinary course of commerce, trade, or use.  In addition, Savencia Cheese engaged in substantial and not isolated activities within the State of Florida.

3.      Venue is proper in this district because a substantial part of the events or omissions giving rise to this action occurred in, and Plaintiffs were damaged in, this district.  28 U.S.C. § 1391(a)(2).

## THE PARTIES

4.      ECB USA is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

5.      Atlantic Ventures is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

6.      Upon information and belief, Bongrain is a citizen of France.  Bongrain is the chairman of Savencia, S.A. ("Savencia"), a non-party to this action.  He is also chairman of many of Savencia's affiliates involved in the frauds and other criminal acts addressed in this action. Bongrain participated in, and directed, the criminal activities and frauds addressed in this action.

7.      Upon information and belief, Ragnet is a resident of the state of Pennsylvania. At all relevant times, Ragnet was secretary general of Savencia and its affiliates involved in this action.  Ragnet was president of Zausner Foods Corp. ("Zausner") and is now president of AFP

Advanced Food Products, LLC (another affiliate of Savencia). Ragnet participated in, and directed, the frauds and other criminal activities addressed in this action.

8.      Upon information and belief, Wild is a resident of the state of Pennsylvania.  At all relevant times, Wild was the group chief financial officer for the North American affiliates of Savencia. He also was, unbeknownst to the ECB Representatives, secretly the *de facto* chief executive officer of Schratter from June 30, 2014, until December 31, 2014. Wild participated in, and directed, the frauds and other criminal activities addressed in this action.

9.      Upon information and belief, Swartele is a resident of the state of New Jersey.  At all relevant times, Swartele was a director of Savencia, and an officer and director of several of Savencia's affiliates.  Swartele participated in, and directed, the frauds and other illegal activities addressed in this action.

10.      Savencia Cheese is a limited liability company formed under the laws of Delaware, with its principal place of business in Pennsylvania.  Upon information and belief, Savencia Cheese's member (owner) is a French company based in France.  Savencia Cheese was formerly named Alouette Cheese USA, LLC.  At all relevant times, Savencia Cheese was an affiliate of Savencia and Zausner and distributed cheese to Schratter and other companies.  Savencia Cheese conspired with the other Bongrain Defendants to commit the frauds and other criminal activities addressed in this action.

## NON-DEFENDANT MEMBERS OF THE BONGRAIN CONSPIRACY

11.      Savencia is a multinational conglomerate based in France.  Savencia is the direct or indirect parent of the companies participating in the conspiracy addressed in this action. Savencia directed, and participated in, the frauds and other criminal activities addressed in this action.

12.     Zausner is a corporation doing business throughout the United States.  Zausner is an indirect subsidiary of Savencia, which provides management for its affiliates.  Zausner was an active participant in the frauds and other criminal activities addressed in this action.

13.     ZNHC, Inc. ("ZNHC") was a corporation which was merged into Zausner. Savencia and Zausner provided management for ZNHC.  ZNHC was an active participant in the frauds and other criminal activities addressed in this action.  For the purposes of this Complaint, any reference to Zausner includes ZNHC.

14.     Voss conspired with the Bongrain Defendants to commit the criminal activities and frauds addressed in this action.  Voss was a fiduciary of the ECB Representatives and Plaintiffs and an officer and director of Atlantic Ventures and Schratter.  Voss acted as the Bongrain Defendants' "inside man" within Plaintiffs' organizations, all the while serving his own interests and those of the Bongrain Defendants.

15.     At all relevant times, Bertrand Proust ("Proust") was the group chief financial officer for Schratter.  Proust was a fiduciary of Atlantic Ventures, but all the while serving his own interests and those of the Bongrain Defendants.

## THE SCHRATTER ENTERPRISE

16.     Schratter was also an enterprise within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Schratter was an otherwise legitimate business used as an instrument by the Bongrain Defendants, who exploited their control over Schratter, and appropriated it as a vehicle to commit their frauds and other criminal activities.  Schratter was also a victim of the Bongrain Defendants' criminal scheme.

## FACTUAL ALLEGATIONS

### Introduction

17.     Savencia is the second largest producer of cheese in France with over $4.8 billion in sales in 2018.  Savencia manufactures and sells cheese and other dairy products in over 120 countries.

18.     The Savencia brands include many of the products found in supermarkets in the United States.

19.     Over twenty years ago, Savencia, then known as Bongrain, S.A., purchased Schratter to develop as its distribution arm in the United States.

20.     Over time, Schratter became a market leader for the distribution of specialty cheese and other dairy products to supermarket chains, grossing over $200 million in 2012, much of which was from the sale and distribution of Savencia products.

21.     For over 20 years, until June 30, 2014, Voss was president and chief executive officer of Schratter and, through his company Voss Enterprises, Inc. ("VEI"), owned twenty-five percent of Schratter's shares.

22.     Until the end of June 2014, Zausner owned seventy-five percent of Schratter's stock.  Thereafter, until the sale to Plaintiffs, Zausner owned one hundred percent of Schratter's stock.

23.     Sometime in the first half of 2013, the Bongrain Defendants began migrating the distribution business away from Schratter and into a different affiliate.

24.     Instead of simply transferring Schratter's operation to another affiliate, the Bongrain Defendants stripped Schratter of assets, and then defrauded Plaintiffs into buying Schratter's valueless shell.

25.     In mid-to-late 2014, the ECB Representatives became enmeshed with the Bongrain Defendants when the Bongrain Defendants and Voss began their efforts to fraudulently entice ECB's Representatives to purchase all of Schratter's stock.

## Nature of the Bongrain Conspiracy

26.     As more fully set forth, *infra*, the Bongrain Defendants engaged in at least three separate but related frauds and other criminal acts, victimizing Plaintiffs and Schratter.

## The "Inside Man" Fraud

27.     The Bongrain Defendants understood that the ECB Representatives did not have any experience in the cheese distribution business and, if they were to buy Schratter, they would have to do so with Schratter's then senior management in place.   Moreover, the Bongrain Defendants understood that the senior members of ECB did not have permission to work in the United States.   These facts created an opportunity for the Bongrain Defendants to fraudulently induce the ECB Representatives, and thereafter Plaintiffs, to accept Voss as a fiduciary and partner.

28.     Accordingly, even though the Bongrain Defendants had previously stripped Voss of his powers and offices as president and chief executive officer of Schratter (*see infra*), the Bongrain Defendants lied to the ECB Representatives and told them that Voss was the extant president and chief executive officer of Schratter.  The Bongrain Defendants also held Voss out as their trusted, knowledgeable, and effective chief, for the purpose of persuading the ECB Representatives to accept Voss as a fiduciary and to partner with him to purchase Schratter.

29.     In reliance on the Bongrain Defendants' representations, the ECB Representatives, and thereafter Plaintiffs: (a) took Voss as a fiduciary; (b) partnered with Voss to purchase Schratter; (c) relied on Voss for much of the diligence regarding the acquisition of Schratter; (d) "retained" Voss as president and chief executive officer of Schratter; and (e) appointed Voss as

the president of Atlantic Ventures.  As a fiduciary, and in furtherance of the conspiracy undertaken by the Bongrain Defendants, Voss: (a) fraudulently helped persuade Plaintiffs to purchase Schratter at an inflated price; (b) took control of Plaintiffs' due diligence to advance the fraud; (b) helped the Bongrain Defendants in their criminal activities to drain Schratter of its assets and drive it into insolvency; and (c) covered up the Bongrain Defendants' misdeeds (collectively, the "Inside Man Fraud").  Voss and the Bongrain Defendants were able to accomplish the Inside Man Fraud by misrepresenting Voss's role and offices in Schratter and his relationship with the Bongrain Defendants.

## The Stock Purchase Fraud

30.     After convincing the ECB Representatives to accept Voss as a fiduciary, the Bongrain Defendants induced Plaintiffs to purchase Schratter at a grossly inflated price (the "Stock Purchase Fraud").  The Bongrain Defendants accomplished the Stock Purchase Fraud through misrepresentations and concealment of material information.

## The Distribution Agreement Fraud

31.     The third fraud consisted of revoking discounts and rights to purchase foreign cheese products that were negotiated as consideration for Plaintiffs' purchase of Schratter.  The Bongrain Defendants and Voss did so by executing a distribution agreement on behalf of Savencia Cheese and Schratter on June 30, 2015 (the "Distribution Agreement") that purported to change the terms of the Stock Purchase Agreement dated December 6, 2014 (the "Stock Purchase Agreement") without the written consent of Plaintiffs, who were parties to the Stock Purchase Agreement (the "Distribution Agreement Fraud").  The Distribution Agreement Fraud allowed Savencia Cheese to (a) overcharge for the foreign cheeses it sold to Schratter; and (b) to cease

distributing other foreign cheeses to Schratter. The inflated prices and denial of products, together with the loss of value of Schratter as an ongoing concern, damaged Plaintiffs and Schratter.

32.     Together, the Inside Man Fraud, the Stock Purchase Fraud, and the Distribution Agreement Fraud are referred to as the "Bongrain Conspiracy."

33.     The Bongrain Conspiracy resulted in tremendous and improper financial gain to the Bongrain Defendants, caused damage to Plaintiffs in excess of $100 million, and drove Schratter, Zausner's largest distribution competitor, into insolvency.

### The Bongrain Defendants Persuade Voss and Proust to Join the Bongrain Conspiracy

34.     In order to perpetrate their frauds and other criminal acts, the Bongrain Defendants needed the assistance of key insiders of Schratter as co-conspirators, including Voss and Proust, the former CFO of Schratter.

35.     On June 30, 2014, shortly before the ECB Representatives began negotiating the purchase of Schratter, the Bongrain Defendants caused Schratter and Zausner to enter into a series of agreements with Voss to lock-down his loyalty (the "June 30 Agreements").

36.     Among the June 30 Agreements was a letter signed by Bongrain that set up a secret corporate structure that violated the documents defining Schratter's corporate governance.

37.     Article IV(3) of Schratter's by-laws provides, in pertinent part:

> The **president shall be the chief executive officer** of the corporation; he shall preside at all meetings of the shareholders and of the board; **he shall have the management of the business of the corporation**….

(Emphasis added).

38.     Despite the clear mandate of the by-laws, one of the June 30 Agreements falsely purported to maintain Voss as president and chief executive officer of Schratter, while, in fact,

divesting him of virtually all authority for said positions and secretly vesting such duties and

authority in Wild (the "Schratter Employment Letter").

39.     The Schratter Employment Letter explains:

The parties understand that, in view of [Voss's] history with  [Schratter], **the title President/Chief Executive Officer (other than as it applies to [Schratter's] Corman Shipping Supplies Division) is mainly to enhance the effectiveness of Employee's sales efforts.**

**All other aspects of the operation of [Schratter] shall be the responsibility of J. Wild, who although carrying the title of Executive Vice President, will have the de facto position of Chief Executive Officer.**  These responsibilities shall include, but not be limited to:

1.  Finance
2.  Human Resources
3.  Quality
4.  Information Systems
5.  **All other corporate functions.**

(Emphasis added).

40.     Under the Schratter Employment Letter, Voss was not even to report to the *de facto* Chief Executive Officer Wild, but "to [Bongrain] Chairman ... and his special designate, [Ragnet]."

41.     In an effort to conceal the corporate deceit, the Bongrain Defendants required Voss to sign a confidentiality agreement regarding the secret terms of his continued employment.  The confidentiality agreement was executed by Gitlin and is attached to the Schratter Employment Letter.

42.     In addition to paying Voss his full salary for his fictitious role as president/chief executive officer of Schratter, the Bongrain Defendants, through Schratter, further promised to pay Voss an additional $350,000 for the year 2015 (one of the years during which the Bongrain Conspiracy took place) through a second employment letter between Voss and a newly-created shell - Corman Ship Supplies, LLC ("Corman") (the "Corman Employment Letter").  Corman was a company with no activities and no assets.

43.     The Corman Employment Letter was also signed by Bongrain and directed Voss to report directly to Bongrain or, in his absence, Ragnet.

44.     As with the Schratter Employment Letter, the Corman Employment Letter contained a confidentiality agreement, also signed by Gitlin.

45.     In sum, Schratter's management was taken over by a select group comprised of the most senior management of the Savencia family of companies, specifically: Bongrain, chairman and controlling shareholder of Savencia; Ragnet, president of Zausner and AFP Advanced Food Products, LLC; Wild, CFO of the North American Affiliates of Savencia; Gitlin, chief legal officer and secretary of the North American Affiliates of Savencia; and Swartele, director of Savencia. Swartele and Bongrain controlled Schratter's board of directors.

46.     Schratter's corporate books made no reference to the Schratter Employment Letter. There was no resolution of either the board of directors or the shareholders authorizing or referring to the fact that the Schratter Employment Letter had stripped Voss of his duties and that his duties had been assigned to Wild.  State corporate records were not amended to reflect the changes in authority.

47.     Neither the Schratter Employment Letter, nor the Corman Employment Letter, nor the substance or significance of their terms, were ever disclosed as part of the due diligence in connection with the purchase of Schratter.  The Schratter Employment Letter was kept secret for the next five years until discovered in late July 2019.

48.     The June 2014 Agreements also provided for compensation to Voss for his participation in the Bongrain Conspiracy as follows:

(a)     Purchasing Voss's twenty-five percent interest in Schratter for $3 million;

(b)      Paying Voss up to an additional $1 million;

(c)      Paying Voss twenty-five percent of the net proceeds from the sale of Corman;

(d)      The transfer of Chocolate Stars, a valuable division of Schratter, to Voss for one dollar; and

(e)      Financing Voss's "purchase" of Chocolate Stars' inventory with an unsecured loan in the amount of $676,852.97, bearing interest at one percent per annum.

49.      Bongrain, Ragnet, Gitlin, Swartele, and Wild committed acts in furtherance of the Bongrain Conspiracy by, among other actions, signing and approving the June 2014 Agreements.

50.      In furtherance of the Bongrain Conspiracy and cover-up, the Bongrain Defendants recruited Schratter's then CFO, Proust.  In exchange for Proust's assistance, Ragnet and Voss agreed to pay Proust $50,000 after the completion of the fraudulent sale of Schratter.

51.      Proust was an important part of the conspiracy because he had been a senior manager at Constantin Associates, LLP ("Constantin"), the accounting firm that audited Schratter's financial statements.  As a senior manager of Constantin, Proust was in charge of Schratter's audits from 2007 through 2012, before becoming employed by Schratter in 2013.

52.      When a manager of an auditor is hired by an audit client, the new employment creates independence and familiarity issues that allow an audit client to exercise undue influence over, and to corrupt, audits.  This is one of the key reasons why laws and auditor standards prohibit auditors from immediately commencing employment with their audit clients when their auditing firm retains the client relationship.

53.      Using Proust, the Bongrain Defendants and Voss exercised undue influence over the audits of Schratter's financial statements and internal controls.

54.     Using Proust and Voss, the Bongrain Defendants had free reign to fraudulently inflate Schratter's financial statements, conceal Schratter's financial condition and deficiencies in its internal controls, and hide related party transactions and its corporate organization and management structure.   This created an environment of financial fraud, misrepresentation, misreporting, omissions, and confusion.

### The Bongrain Defendants Implement the Inside Man Fraud

55.     In late summer of 2014, Voss was introduced to ECB Representatives Claude Blandin, Bruno Blandin (collectively, the "Blandins") and Arno Leoni ("Leoni").

56.     Voss, Bongrain, Gitlin, Ragnet, and Wild, along with the other members of the Bongrain Conspiracy, misrepresented to Leoni, the Blandins, and other ECB Representatives, that Voss was the president and chief executive officer of Schratter, and that the Bongrain Defendants had complete trust and confidence in Voss's ability to control and manage the operations of Schratter.

57.     Voss, Bongrain, Gitlin, Ragnet, and Wild, along with the other members of the Bongrain Conspiracy, kept secret the fact that Voss had been stripped of his duties and powers as Schratter's president and chief executive officer as of June 30, 2014, and that Wild was, in fact, the *de facto* chief executive officer, and holder of virtually all corporate authority for Schratter.

58.     Voss, Bongrain, Gitlin, Ragnet, and Wild, along with the other members of the Bongrain Conspiracy, also concealed the existence of the Schratter Employment Letter and the Corman Employment Letter.

59.     Over the ensuing months, the Bongrain Defendants and Voss continued to hold out Voss out as chief executive officer and president of Schratter, keeping secret the fact that they had stripped Voss of virtually all authority in June 2014.

60.     Voss and the Bongrain Defendants concealed the fact that a small group of Savencia senior managers (the Bongrain Defendants) controlled the day-to-day operations of Schratter.

61.     The Bongrain Defendants knew that the Blandins, Leoni, and ECB had no experience in the cheese and other dairy business, and thus, would not acquire Schratter without Schratter's purported senior management in place.  The Bongrain Defendants also knew that the members of ECB's senior management were not eligible to work in the United States.

62.      The Bongrain Defendants represented to the Blandins and Leoni that they had complete confidence and trust in Voss as the chief executive officer running a $200 million cheese company. They represented that Voss was indispensable. The Bongrain Defendants encouraged the ECB Representatives, and thereafter Plaintiffs, to accept Voss as a fiduciary and a partner and "retain" him as president and chief executive officer.

63.     On October 1, 2014, Voss, as principal of VEI, signed a letter of intent to purchase Schratter from ZNHC/Zausner.  At that time, the Bongrain Defendants were aware that Voss was in discussions with the ECB Representatives who wanted to undertake due diligence regarding Schratter prior to entering into a contract to purchase Schratter.

64.     The letter of intent provided that Zausner would establish a virtual data room through which the Bongrain Defendants would provide the information to be reviewed and relied upon by ECB, the Blandins, Leoni, and their professional consultants in connection with due diligence.  The data room was designed to, and did, provide online access to information and documents from Zausner to the ECB Representatives and their professional advisors and consultants across state lines and international boundaries in Europe, the Caribbean, Pennsylvania, New Jersey, Florida, and elsewhere.

65.     The data room was created to "afford [Plaintiffs] and [the ECB Representatives] reasonable access to, and the right to inspect, all of the properties, assets, premises, books and records, contracts, agreements, and other documents and data related to [Schratter]."

66.     The letter of intent specifically stated:

> Subject to signature of NDA's, buyer's investors may receive financial information about [Schratter], third party agreements by which [Schratter] is, or may be, bound and such other documents may agree **through a data room controlled by** [**Zausner**].

(Emphasis added)

67.     The data room was controlled by Zausner.  During the first two weeks of October 2014, Zausner's IT Technical Services Manager sent emails across state lines and international boundaries to the ECB Representatives with "USERNAME and PASSWORD credentials" for the "data room."

68.     Access to the data room was provided by Zausner to, among others, ECB Representatives in Europe and the Caribbean, consultants in France and the United States, and to lawyers in New York, France, and Florida.

69.     The Bongrain Defendants used the data room to disseminate documents across state lines and international boundaries.  The ECB Representatives, Plaintiffs, and their professional advisors and consultants received and reviewed financial, managerial, and other pertinent documents and information regarding Schratter by electronic means from the data room.

70.     Gitlin, Ragnet, Wild, Bongrain and Voss represented to the ECB Representatives, Plaintiffs, and their professional advisors and consultants that **all** pertinent documents had been uploaded into the data room and the documents were **complete, accurate, and truthful**.

71.     The information in the data room was **incomplete, inaccurate, and untruthful**. For example, the data room included documents falsely stating that Voss was the president and the chief executive officer of Schratter.

72.      The Bongrain Defendants withheld from the data room documents that established that Wild, and not Voss, was the *de facto* chief executive officer, holding virtually all day-to-day control over Schratter.   The Bongrain Defendants withheld from the data room the Schratter Employment Letter and the Corman Employment Letter.

73.     The Bongrain Defendants included in the data room two documents that misrepresented the management structure of Schratter. The first document was a list of Schratter's directors and officers, identifying Voss as president and chief executive officer. The list made no mention of Wild. The second document was a management chart that identified Voss as the president and chief executive officer and Wild as the executive vice president, making no mention of the fact that Wild, in fact, was *de facto* chief executive officer.

74.     The Bongrain Defendants also misrepresented Voss's role with Schratter in both the draft of a letter of intent and the signed letter of intent relating to the purchase of Schratter. These documents were transmitted across state lines by Gitlin on September 25 and October 1, 2014.  They were later re-transmitted across state and international lines by Voss.

75.     The final version of the letter of intent was prepared and executed by Gitlin and further executed by Voss.

76.     All versions of the letter of intent misrepresent that Schratter was "owned by Seller but **managed on a day-to-day basis by [Voss]**… **in his role as Company President/CEO."** (Emphasis added).

77.     On an issue as straightforward and simple as corporate governance, the Bongrain Defendants perpetuated their misrepresentations regarding Voss's offices and duties in the Stock Purchase Agreement signed on December 6, 2014, in which they reiterated their representation that Schratter had been operated in the ordinary course of business since August 1, 2014 when, in fact, the day-to-day operations of Schratter were secretly controlled, and the chief executive function was secretly held, by Wild.

78.     During the entire period commencing in August 2014 and continuing through the purchase in December 2014, the Bongrain Defendants and their co-conspirators continued to misrepresent that Schratter was being operated in the ordinary course of business when, in fact, it was being run by a group of Savencia senior managers who secretly took over the business of Schratter to commit the frauds and other criminal acts addressed in this action.

79.     The ECB Representatives, and thereafter Plaintiffs, relied upon the representations of the Bongrain Defendants and Voss that Voss was president and chief executive officer of Schratter, that Voss was a trusted executive who controlled and ran the day-to-day operations of Schratter, and that Voss was indispensable to the success of Schratter.

80.     Consequently, the ECB Representatives, and thereafter Plaintiffs, entered a fiduciary relationship with Voss, took him as a partner to purchase Schratter, appointed him as president of Atlantic Ventures, and "retained" him as president and chief executive officer of Schratter.

81.     The Bongrain Defendants succeeded in their effort to install their "inside man" in Schratter and within Plaintiffs' organization. With Voss in place, the Bongrain Defendants were able to move forward with their plan to fraudulently induce Plaintiffs to purchase Schratter.

## The Stock Purchase Fraud

82.     In August 2014, the Bongrain Defendants, acting through Bongrain, Ragnet, Gitlin, Wild, and Voss, began negotiations with the ECB Representatives for the sale of Schratter.

83.     The negotiations continued with Voss and the Bongrain Defendants, with the ECB Representatives reasonably believing that Voss represented their interests and, ultimately, Plaintiffs' interests, while, in fact, he was representing his own interests and those of the Bongrain Defendants.

84.     At the outset of negotiations, Voss falsely represented to Leoni and the Blandins that Schratter was valued at $40 million. In support of this, in September 2014, Voss and the Bongrain Defendants told the ECB Representatives, that ZNHC purchased VEI's twenty-five percent interest in Schratter for $10 million. These false representations were later reaffirmed to the ECB Representatives and Plaintiffs prior to the purchase of Schratter.

85.     The representations as to Schratter's value were false when they were made.  ZNHC had not purchased VEI's shares for $10 million. It purchased VEI's shares for $3 million.

86.     During the end of September 2014, Voss, Bongrain, Ragnet, Wild, and Gitlin prepared a letter of intent which outlined a potential deal pursuant to which Voss, together with ECB, would purchase Schratter.

87.     Pursuant to the letter of intent, the purchase price for Schratter was $35 million.

88.     During the period commencing in September 2014 and continuing thereafter, Voss, Bongrain, Ragnet, Wild, and Gitlin repeatedly misrepresented that VEI had been paid $10 million for its twenty-five percent of Schratter.

89.     The Bongrain Defendants concealed the true purchase price for VEI's interest in Schratter. The data room did not include the June 30, 2014 contract for the purchase of VEI's

shares for $3 million. The Bongrain Defendants intended for the ECB Representatives and, ultimately Plaintiffs, to rely upon this misinformation.

90.     The Bongrain Defendants also intended for the ECB Representatives and, ultimately Plaintiffs, to rely upon Schratter's audited financial statements.

91.     Knowing the importance of the audited financial statements, Voss, Bongrain, Ragnet, Gitlin, Wild, and Swartele made a series of misrepresentations to the ECB Representatives and Plaintiffs regarding the audited financial statements.  Specifically, they misrepresented that:

(a)     Schratter's financial statements correctly reflected Schratter's liabilities;

(b)     Schratter's financial statements were accurate, and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(c)     Schratter's internal controls and procedures were sufficient to ensure that Schratter's financial statements were accurate in all material respects;

(d)     the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(e)     the financial statements revealed all related party transactions; and

(f)     no material information relative to Schratter's financial position and operations was withheld from the financial statements.

92.     The misrepresentations regarding the audited financial statements were made orally and in writing.  Among the instances of written misrepresentations are the multiple drafts of the purchase documents for sale of Schratter, which were all transmitted across state lines and

international boundaries by, among others, Gitlin, Ragnet, and Voss, including, but not limited to, November 7, 10, 25, 26, 27, 2014 and December 4 and 5, 2014.

93.     All the above representations regarding Schratter's audited financial statements were false when they were made, and the Bongrain Defendants knew the representations were false when they were made.

94.     In addition to the misrepresentations and omissions set forth above, during the period of time from October 1, 2014 through the closing of the purchase of Schratter under the Stock Purchase Agreement, Bongrain, Ragnet, Wild, Gitlin, Swartele, and Voss each made the following misrepresentations in order to induce Plaintiffs to execute the purchase documents:

(a)     Voss was the president and chief executive officer of Schratter in form and substance and in charge of Schratter's day-to-day operations;

(b)     Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(c)     Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the data room;

(d)     The transactions set forth in Schratter's books and records represented bona fide transactions and complied with all applicable laws and industry standards;

(e)     Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(f)     Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(g)      Schratter's operations were conducted in the ordinary course of business;

(h)      Schratter complied with all laws in its operations;

(i)      VEI was paid $10 million for its twenty-five percent interest in Schratter;

(j)      Schratter was in compliance with all of its financial obligations; and

(k)      Schratter suffered no adverse events in the months before the closing of the sale.

95.      Unbeknownst to the ECB Representatives and Plaintiffs, while they were in the process of negotiating the purchase of Schratter, the Bongrain Defendants and their co-conspirators stripped Schratter of valuable assets, including business relationships, further depleting Schratter's value.

96.      The Bongrain Defendants also caused Schratter to pay vendors and debts related to Savencia, while failing to pay third-party debts, all in an effort to bleed assets out of Schratter before closing the sale.

97.      The Stock Purchase Fraud and the Inside Man Fraud worked together to ensure that the Bongrain Defendants were able to sell a diminished Schratter at an inflated price.

98.      Using Voss's position of trust and confidence, the manipulation of the due diligence process, the suppression of material information, and lies, the Bongrain Defendants hid the many red flags and acts that would have alerted the ECB Representatives and Plaintiffs to the frauds.

99.      On December 5, 2014, ECB formed ECB USA.  The next day ECB USA, together with Voss and his company, VEI, signed the Stock Purchase Agreement with ZNHC for the

purchase of 100 percent of Schratter's shares for $27 million, payable as follows: $2 million at closing; $15 million six months later; and $10 million over the next four years.

100.    Four days later, on December 9, 2014, VEI and ECB USA formed Atlantic Ventures. The purpose of Atlantic Ventures was to serve as the holding company for Schratter.  At that time, Atlantic Ventures was owned fifty-five percent by ECB USA and forty-five percent by VEI.  Prior to closing, ECB USA and VEI assigned their rights in the Stock Purchase Agreement to Atlantic Ventures.

101.    On December 9, 2014, Atlantic Ventures appointed Voss as its president and a director.

102.    During the period between December 9, 2014 and the closing on December 31, 2014, ECB USA and Atlantic Ventures continued their due diligence under the supervision of Voss. The Bongrain Defendants represented that they provided Plaintiffs and their professional advisors and consultants with full and complete access to accurate information. The Bongrain Defendants continued to represent that Voss was Schratter's president and chief executive officer, in substance and fact, and that he would continue as a loyal and indispensable chief executive going forward.

103.    These continuing misrepresentations were known by the Bongrain Defendants to be false when they were made, and Plaintiffs continued to reasonably rely on these misrepresentations.

104.    During December 2014, Voss, Bongrain, Ragnet, Wild, Swartele, and Gitlin each, once again, represented that the accounting records of Schratter were accurate and that the audits were completed in accordance with US GAAP, GAAS, and IFRS standards.

105.    On or about December 31, 2014, Atlantic Ventures closed its purchase of Schratter's stock and paid the initial $2 million.

106.    After closing, Atlantic Ventures "maintained" Voss in the positions of president and chief executive officer of Schratter.  ECB USA maintained Voss's position as a director and president of Atlantic Ventures.

107.    Plaintiffs continued to put their trust in Voss and believed that Voss would honor his duties of loyalty, care, and good faith.

108.    The Bongrain Defendants knew that Voss was a fiduciary of Plaintiffs and that Plaintiffs placed their trust and confidence in Voss.

109.    Plaintiffs did not know that Voss was the Bongrain Defendants' "inside man" whose real loyalties were to the Bongrain Defendants, Zausner, Savencia, and himself.

110.    Plaintiffs, not suspecting that Voss was the Bongrain Defendants' "inside man" and believing Voss to be a fiduciary appropriately loyal to Plaintiffs, allowed Voss to take the lead with regard to the continuing negotiations of all matters with the Bongrain Defendants, Zausner, and Savencia.

111.    Further, Plaintiffs intended to rely on the newly available audited financial statements and additional due diligence derived from financial statements for the year 2014.

112.    The Bongrain Defendants knew and expected that Plaintiffs would rely on the audited financial statements because Zausner was required to deliver the audited financial statements to Plaintiffs under the Stock Purchase Agreement.

113.    On February 23, 2015, Gitlin transmitted the audited financial statements across state lines from Wilmington, Delaware, to ECB USA's representatives in France and to Voss in New Jersey by Federal Express.

114.     Plaintiffs did not know that Voss, aided by Proust, exercised undue influence on Constantin's audit team, which permitted the Bongrain Defendants to present Schratter's 2014 financial statements with material misstatements. The financial statements and the certifications by the auditors were not in compliance with US GAAP, GAAS, and IFRS standards.

115.     Based upon information and belief, Voss was paid additional and secret sums by the Bongrain Defendants and/or Savencia for the role he played as their "inside man" during the due diligence process.

116.     In June 2015, in reliance upon the misrepresentations made by the Bongrain Defendants, in reliance upon Voss as president and chief executive officer of Schratter, and in reliance upon the misrepresentations that the financial statements had been completed in accordance with US GAAP, GAAS, and IFRS, Plaintiffs paid the second installment of $15 million to Zausner.

117.     During the period between January 1, 2015 and June 30, 2015, Plaintiffs made millions of dollars of additional investments in Schratter and paid Savencia affiliates large sums of monies.

118.     But for the fraud, misrepresentations, misreporting of financial information, and omissions of material information, Plaintiffs would not have purchased Schratter, paid $2 million at closing, funded the ongoing operations of Schratter, or paid the $15 million installment of the purchase price.

119.     Additionally, but for the fraud, misrepresentations, misreporting of financial information, and omissions of material information, Plaintiffs would not have invested millions of dollars of additional monies into Schratter and its operations.

### The Bongrain Defendants Fraudulently
### Deprive Schratter of Valuable Contract Rights

120.    It was not enough for the Bongrain Defendants that they had already bilked Plaintiffs out of $17 million.

121.    Schratter was in the cheese distribution business and was an obstacle to the Bongrain Defendants' attempt to establish its own distribution company.

122.    One of the material inducements for Plaintiffs to enter the Stock Purchase Agreement was the commitment by the Bongrain Defendants that Schratter would be given discounted pricing on, and the rights to distribute, Savencia products for a period of ten years.

123.    Just as they had done with regard to the sale of Schratter, the Bongrain Defendants used Voss, their "inside man," to secretly undermine and take away the rights granted to Schratter in the Stock Purchase Agreement.

124.    The Bongrain Defendants and their co-conspirators concealed this fraud from Plaintiffs.

125.    Once again, the Bongrain Defendants' "inside man" played an indispensable role in the completion of another fraud.

### The Bongrain Defendants Succeed in
### Driving Schratter Out of Business

126.    During the three years after Atlantic Ventures' purchase of Schratter, Voss and Proust, "cooked the books" to make it appear that Schratter's business was doing far better than it actually was.  Voss and the Bongrain Defendants used this device to conceal the frauds and criminal acts addressed in this action.

127.    Both before and after the closing of the Schratter purchase, Voss and Proust worked in concert to misreport Schratter's financial condition and conceal the frauds and other criminal activities.

128.    Voss and Proust concealed the Bongrain Conspiracy and effectively prevented Schratter and Plaintiffs from pursuing available remedies worth millions of dollars against the Bongrain Defendants, Zausner, and Savencia.

129.    Schratter terminated Voss and Proust in 2017.

130.    Atlantic Ventures terminated Voss in 2017.

131.    With Voss and Proust no longer in their positions, Plaintiffs started uncovering significant financial discrepancies and other fraudulent activities within Schratter.

132.    Plaintiffs continued to infuse additional capital into Schratter hoping Schratter could avoid insolvency.

133.    On April 30, 2018, an insolvent Schratter became subject to an assignment for the benefit of creditors in Florida.

134.    But for the fraud, misrepresentations, misreporting of Schratter's finances, and concealments, Plaintiffs would not have purchased or otherwise capitalized the acquisition or operations of Schratter, and would not have taken Voss as a fiduciary or appointed him as Atlantic Ventures' president, and "retained" him as Schratter's president and chief executive officer.

135.    The ruse of holding Voss out as president and chief executive officer of Schratter, after having stripped him of his duties and powers, enabled the Bongrain Defendants to conceal frauds and other criminal acts.

136.    All conditions precedent to bringing this action have been performed, satisfied, excused, or waived.

## <u>COUNT I</u>
## Federal Civil RICO, 18 U.S.C. § 1962(c)

137.    Plaintiffs incorporate by reference paragraphs 1 through 136 as though more fully set forth herein, and further allege:

138.     The Bongrain Defendants violated the RICO Act and Plaintiffs were injured as a result.

139.     Each individual Defendant is a "person" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

140.     Each individual Defendant violated 18 U.S.C. § 1962(c) by agreeing to participate and by participating in the acts described in paragraphs 16 through 136 and further described below.

141.     **The Schratter Enterprise**. Schratter was an otherwise legitimate business venture that was used by the Bongrain Defendants and their affiliates to commit illicit and illegal acts. Schratter is a corporation and qualifies as an enterprise within the meaning of 18 U.S.C. § 1961(4). The various members of the Bongrain Conspiracy used Schratter as a passive vehicle to conduct their racketeering activities.

142.     Alternatively, the Savencia controlled companies together constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

143.     **Pattern of Racketeering Activity.**  The Bongrain Defendants, each of whom were persons associated with Schratter, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by the Bongrain Defendants' regular and repeated use of the facilities and services of the enterprise. The Bongrain Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

144.     The predicate acts of racketeering were not isolated, but rather, the acts of the Bongrain Defendants were related in that they had the same or similar purpose and result,

participants, victims, and method of commission.  Further, the acts of racketeering by the Bongrain Defendants were continuous.  The Bongrain Defendants engaged in repeated conduct during a four-year period beginning in June 2014 and continuing until the insolvency of Schratter in mid-2018.

145.    Schratter was not only used by the Bongrain Defendants to engage in racketeering activity but existed separate and apart from the pattern of racketeering activity for the legitimate purpose of manufacturing and distributing cheese to customers. Schratter was a legitimate business corrupted through the bad acts of the Bongrain Defendants and their co-conspirators for the purpose of committing the frauds and other criminal activities addressed in this action.

146.    The Bongrain Defendants and their co-conspirators directed and participated in the operation and management of the Schratter Enterprise by overseeing, coordinating, and acting in furtherance of the acts of racketeering described below.

147.    **Predicate Act: Use of Mails and Wires to Defraud Plaintiffs in Violation of 18 U.S.C. §§  1341 and 1343**. The Bongrain Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs to obtain money from Plaintiffs by means of false or fraudulent pretenses, representations, or promises. For the purpose of executing their scheme or artifice, the Bongrain Defendants caused delivery of, or received various documents and things by, United States mail or by private or commercial interstate carriers. The Bongrain Defendants also transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings and other communications. The Bongrain Defendants carried out the foregoing acts with the knowledge that the use of the mails or wires would follow in the ordinary

course of business.  These acts were done intentionally and knowingly with the specific intent to advance the Bongrain Defendants' scheme or artifice.

148.    The Bongrain Defendants carried out their scheme in different states and countries and could not have done so unless they used the United States mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme, the Bongrain Defendants communicated amongst themselves, with other members of the Bongrain Conspiracy, and with Plaintiffs in furtherance of the scheme to defraud Plaintiffs. These communications were typically transmitted by wire (*i.e.*, electronically) and/or through the United States mail or private commercial carriers.

149.    Among other things, the interstate transmissions or deliveries included:

(a)     the Schratter Employment Letter and drafts thereof in June 2014;

(b)     the Corman Employment Letter and drafts thereof in June 2014;

(c)     the documents, including drafts, regarding the purchase of VEI's shares of Schratter in June 2014;

(d)     the documents, including drafts, related to the sale of the Chocolate Stars division in June 2014;

(e)     the letter of intent and drafts thereof in September and October 2014;

(f)     drafts of the Stock Purchase Agreement in October, November, and December 2014;

(g)     The executed Stock Purchase Agreement in December 2014;

(h)     Amendment 1 to the Stock Purchase Agreement and drafts thereof in June 2015;

(i)     The Distribution Agreement and drafts thereof in June 2015;

(j)     All due diligence documents in the data room from October 2014 through December 2014; and

(k)     All invoices to Schratter from Savencia Cheese related to sale of cheese from June 2015 through Schratter's insolvency in 2018.

150.    The Bongrain Defendants and their co-conspirators made hundreds, if not thousands, of interstate and/or international communications using mail or wire during the course of negotiations, execution and delivery of all of the foregoing documents.

151.    The Bongrain Defendants negotiated the Stock Purchase Agreement with Plaintiffs and the ECB Representatives and caused the Stock Purchase Agreement, and drafts of it, to be disseminated from Pennsylvania or Delaware to New Jersey, Florida, and internationally.

152.    The Bongrain Defendants used wire transfers to facilitate payment of funds to VEI and/or Voss during 2014 and 2015.

153.    The Bongrain Defendants caused Plaintiffs to transmit to them by wire or mail, across state lines, over $17 million for payment of the purchase price under the Stock Purchase Agreement.

154.    The Bongrain Defendants also solicited and received hundreds of excessive and fraudulent payments from Plaintiffs under the Distribution Agreement, which payments were solicited by interstate and international mail and made by interstate and international wire.

155.    The Bongrain Defendants' shared objective was to divert funds to their own benefit and harm Schratter.

156.    **Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §§ 2314 and 2315**. The Bongrain Defendants committed acts constituting indictable offenses under 18 U.S.C. § 2314 by transporting or causing to be transported in interstate or foreign

commerce money having a value of $5,000 or more which was stolen, converted, or taken by fraud. The Bongrain Defendants also committed acts constituting indictable offenses under 18 U.S.C. § 2315 in that they received money in excess of $5,000.00, which crossed a state line or the United States' border after being stolen, unlawfully converted, or taken by fraud. The acts of the Bongrain Defendants set forth above were done willfully and with knowledge that the money was stolen, converted, or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance the Bongrain Defendants' scheme or artifice.

157.    The Bongrain Defendants caused Plaintiffs to transmit to them by wire or mail, across state lines and national boundaries, over $17 million for payment of the purchase price under the Stock Purchase Agreement.  Plaintiffs transmitted to ZNHC/Zausner $2 million by wire across state lines on or about December 31, 2014. Plaintiffs transmitted an additional $15 million to ZNHC/Zausner by wire across state lines on or about June 30, 2015.

158.    Affiliates of the Bongrain Defendants also solicited and received hundreds of payments for cheese from Plaintiffs and/or Schratter which were sent via wire across state lines and/or international boundaries.

159.    The Bongrain Defendants' shared objective was to divert funds to their own benefit and harm Schratter.

160.    **Continuity of Conduct**. The Bongrain Defendants' violation of state and federal law as set forth herein, each of which directly and proximately injured Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately June 2014 until Schratter's insolvency in mid-2018 and was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

161.    The Bongrain Defendants have conducted and/or participated in, directly or indirectly, the conduct of the Schratter Enterprise through a pattern of racketeering activity as defined in violation of 18 U.S.C. § 1962(c).

162.    The unlawful actions of the Bongrain Defendants, and each of them, have directly, illegally, and proximately caused injuries to Plaintiffs in Plaintiffs' businesses, in an amount to be determined at trial.

163.    The unlawful actions of the Bongrain Defendants, and each of them, have directly, illegally, and proximately caused injury to Schratter, its employees, vendors, and customers.  The Bongrain Defendants' unlawful conduct caused special damages including the diminution of the value of Atlantic Ventures' interest in Schratter due to Voss's execution of the Distribution Agreement.

WHEREFORE, Plaintiffs demand entry of judgment against the Bongrain Defendants, jointly and severally, for compensatory, consequential, special, and treble damages, plus costs, pre-judgment and post-judgment interest, attorneys' fees pursuant to 18 U.S.C. § 1964(c), and for such further relief as this Court deems just and proper.

## <u>COUNT II</u>
### Conspiracy to Violate Federal Civil Rico, 18 USC § 1962(d)

164.    Plaintiffs incorporate by reference paragraphs 1 through 136 as though more fully set forth herein, and further allege:

165.    In violation of 18 U.S.C. § 1962(d), the Bongrain Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in paragraphs 137 through 163 above.

166.    Others, including Voss and Zausner, engaged in multiple acts in furtherance of the conspiracy.

167.    The Bongrain Conspiracy commenced at least as early as June 2014 and continued until at least mid-2018.

168.    The Bongrain Conspiracy's purpose was to divert money from Plaintiffs to the Bongrain Defendants and their affiliates for their own benefit and to harm Schratter.

169.    Each of the Bongrain Defendants, and Voss, Zausner, and Savencia, committed at least one overt act in furtherance of the conspiracy. Each agreed to participate in the conspiracy and in achieving the ends of the Bongrain Defendants.  These acts in furtherance of the conspiracy include devising and implementing a secret employment arrangement with Voss, negotiating and implementing the fraudulent sale of the shares of Schratter to Plaintiffs, making false representations about Voss's employment and role in Schratter, the negotiation of Amendment No. 1, inducing payment of the $15 million second installment, the negotiation and execution of the agreements taking away rights of Schratter to certain pricing and products, and other actions designed to harm Schratter.

170.    The purpose of the above-described acts was to advance the overall object of the Bongrain Conspiracy and the harm to Plaintiffs was a reasonably foreseeable consequence of the Bongrain Defendants' actions.

171.    As an immediate, direct, and consequential result of the Bongrain Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial.  The Bongrain Defendants' unlawful conduct caused special damages including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

WHEREFORE, Plaintiffs demand entry of judgment against the Bongrain Defendants,

jointly and severally, for compensatory, consequential, special, and treble damages, plus costs,

pre-judgment and post-judgment interest, attorneys' fees pursuant to 18 U.S.C. § 1964(c), and for

such further relief as this Court deems just and proper.

### COUNT III
### Fraud
### ECB USA against the Bongrain Defendants

172.    ECB USA adopts and incorporates the allegations of paragraphs 1 through 136 of

this Complaint as though more fully set forth herein, and further alleges:

173.    The Bongrain Defendants, together with their co-conspirators, intentionally made

false representations of material facts to ECB USA, including, but not limited to the following:

(a)     Voss was the president and chief executive officer of Schratter;

(b)     the Bongrain Defendants had complete trust and confidence in

Voss's performance and character;

(c)     Voss was trusted, important, and indispensable to the continued

success of Schratter;

(d)     Schratter's value as an operating business was a direct result of, and

dependent upon, Voss being its president and chief executive officer;

(e)     Wild was the executive vice president of Schratter when, in fact, he

was de facto chief executive officer;

(f)     the purpose of the data room was to "provide financial information

and third-party agreements by which the company is, or may be, bound…" and the data

room contained all pertinent documents and that the documents were complete, accurate,

and truthful;

(g)     ZNHC purchased Voss's twenty-five percent interest in Schratter

for $10 million;

(h)     Schratter's financial statements correctly reflected Schratter's liabilities;

(i)     Schratter's financial statements were accurate and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(j)     Schratter's internal controls and procedures were designed to ensure that Schratter's financial statements were accurate in all material respects;

(k)     the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(l)      no material information relative to Schratter's financial position and operations was withheld from the financial statements;

(m)     Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the "data room;"

(n)     the transactions set forth in Schratter's books and records represented bona fide transactions in compliance with all applicable laws and industry standards;

(o)     Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(p)     Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(q)     Schratter's operations were conducted in the ordinary course of

business;

       (r)     Schratter complied with all laws in its operations;

       (s)     Schratter was in compliance with its financial obligations to its lenders; and

       (t)     Schratter suffered no adverse events in the months before the closing of the sale.

174.    The misrepresentations set forth in paragraph 173 and in the factual allegations applicable to this count were false and material when they were made, and the Bongrain Defendants knew they were false and material when they were made.

175.    Similarly, as more fully set forth herein, the Bongrain Defendants concealed material information that was in the exclusive possession of the Bongrain Defendants and their co-conspirators, and the nature of the information was such that the Bongrain Defendants knew that it was material and that the Bongrain Defendants were obligated to disclose it to ECB USA.  The concealment included, among other things, that:

       (a)     Voss had been stripped of his day-to-day control over the Company;

       (b)     Voss had been stripped of the powers and duties associated with the positions of president and CEO;

       (c)     Voss was president and CEO in name only and virtually all corporate power and duties had been given to Wild;

       (d)     Voss was an "inside man" for the Bongrain Defendants and his loyalties were to the Bongrain Defendants and himself;

       (e)     Voss, acting ultra vires, to his authority had entered a secret amendment to the Stock Purchase Agreement that lowered the value of Schratter;

(f)      Proust was acting for the benefit of the Bongrain Conspiracy and against the interests of Schratter and Plaintiffs;

(g)      Constantin did not follow applicable GAAP, GAAS, and IFRS standards when performing the audits of Schratter;

(h)      Constantin was not independent from Schratter in its performance of its audits;

(i)      The 2014 Audit and other audits contained material misrepresentations and omissions; and

(j)      The amount of money paid to VEI for the purchase of his shares in Schratter.

176.      ECB USA did justifiably rely to its detriment on the misrepresentations and on the information that had been concealed in executing the Stock Purchase Agreement, in financing the acquisition and operations of Schratter, and in taking Voss as a fiduciary.

177.      As a direct and proximate result of the fraudulent conduct described above, ECB USA has sustained damages in an amount to be proven at trial.  The Bongrain Defendants' unlawful conduct caused special damages, including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

WHEREFORE, ECB USA demands entry of judgment against the Bongrain Defendants, jointly and severally, for compensatory, consequential, special, and punitive damages, plus costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT IV
### Fraud
### Atlantic Ventures against the Bongrain Defendants

178.    Atlantic Ventures adopts and incorporates the allegations of paragraphs 1 through 136 of this Complaint as though more fully set forth herein, and further alleges:

179.    The Bongrain Defendants, together with their co-conspirators, intentionally made false representations of material facts to Atlantic Ventures, including, but not limited to the following:

(a)    Voss was the president and chief executive officer of Schratter and concealed that he had been stripped of said authority and offices;

(b)    the Bongrain Defendants had complete trust and confidence in Voss's performance and character;

(c)    Voss was trusted, important, and indispensable to the continued success of Schratter;

(d)    Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(e)    Wild was the executive vice president of Schratter when, in fact, he was de facto chief executive officer;

(f)    The purpose of the data room was to "provide financial information and third-party agreements by which the company is, or may be, bound…" and the data room contained all pertinent documents and that the documents were complete, accurate, and truthful;

(g)    ZNHC/Zausner purchased Voss's twenty-five percent interest in Schratter for $10 million;

(h)     Schratter's financial statements correctly reflected Schratter's liabilities;

(i)     Schratter's financial statements were accurate and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(j)     Schratter's internal controls and procedures were designed to ensure that Schratter's financial statements were accurate in all material respects;

(k)     the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(l)     no material information relative to Schratter's financial position and operations was withheld from the financial statements;

(m)     Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the "data room;"

(n)     the transactions set forth in Schratter's books and records represented bona fide transactions in compliance with all applicable laws and industry standards;

(o)     Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(p)     Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(q)     Schratter's operations were conducted in the ordinary course of business;

(r)     Schratter complied with all laws in its operations;

(s)     Schratter was in compliance with its financial obligations to its lenders; and

(t)     Schratter suffered no adverse events in the months before the closing of the sale.

180.    The representations in paragraph 179 were false and material when they were made, and the Bongrain Defendants knew they were false and material when they were made.

181.    Similarly, as more fully set forth herein, the Bongrain Defendants concealed material information that was in the exclusive possession of the Bongrain Defendants and their co-conspirators, and the nature of the information was such that the Bongrain Defendants knew that it was material and that the Bongrain Defendants were obligated to disclose it to Atlantic Ventures. The concealment included, among other things, that:

(a)     Voss had been stripped of his day-to-day control over the Company;

(b)     Voss had been stripped of the powers and duties associated with the positions of president and CEO;

(c)     Voss was president and CEO in name only and virtually all corporate power and duties had been given to Wild;

(d)     Voss was an "inside man" for the Bongrain Defendants and his loyalties were to the Bongrain Defendants;

(e)     Voss, acting ultra vires, to his authority had entered a secret amendment to the Stock Purchase Agreement that lowered the value of Schratter;

(f)     Proust was acting for the benefit of the Bongrain Conspiracy and against the interests of Schratter and Plaintiffs;

(g)     Proust's loyalties were to the Bongrain Defendants and not to Plaintiffs;

(h)     Constantin did not follow applicable GAAP, GAAS, and IFRS standards when performing the audits of Schratter;

(i)     Constantin was not independent from Schratter in its performance of its audits;

(j)     The 2014 Audit and other audits contained material misrepresentations and omissions; and

(k)     The amount of money paid to VEI for the purchase of his shares in Schratter.

182.    Atlantic Ventures did justifiably rely to its detriment on the misrepresentations and on the absence of the information that had been concealed in executing the Stock Purchase Agreement and in financing the acquisition and operations of Schratter.

183.    As a direct and proximate result of the fraudulent conduct described above, Atlantic Ventures has sustained damages in an amount to be proven at trial. The Bongrain Defendants' unlawful conduct caused special damages including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

WHEREFORE, Atlantic Ventures demands entry of a judgment against the Bongrain Defendants, jointly and severally, for compensatory, consequential, special, and punitive damages, plus costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

<u>**COUNT V**</u>
**Conspiracy to Commit Fraud**

184.    Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 136, 173, 175, 179 and 181 of this Complaint as though more fully set forth herein, and further allege:

185.    The Bongrain Defendants entered into a conspiracy with, among others, Voss, Proust, Zausner, Savencia, and Savencia Cheese to defraud Plaintiffs.

186.    As more fully set forth above, each of the Bongrain Defendants committed an overt act in furtherance of the Bongrain Conspiracy.

187.    The Bongrain Defendants and their co-conspirators intentionally made misrepresentations and omissions of material fact as set forth in paragraphs 173, 175, 179, and 181 of this Complaint.  The representations were false and material when they were made, and the Bongrain Defendants knew they were false and material when they were made.

188.    The Bongrain Defendants intended for Plaintiffs to rely, and Plaintiffs did justifiably rely, on the false representations and material omissions in funding the acquisition and operations of Schratter and in taking Voss as a partner, entering into a fiduciary relationship with Voss, appointing him as president of Atlantic Ventures, and "retaining" him as president and chief executive officer of Schratter.

189.    As a direct and proximate result of the fraudulent conduct described above, Plaintiffs have sustained damages in an amount to be proven at trial. The Bongrain Defendants' unlawful conduct caused special damages including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

WHEREFORE, Plaintiffs demand judgment against the Bongrain Defendants, jointly and severally, for compensatory, consequential, special, and punitive damages, together with costs, pre- and post-judgment interest, and for such further relief as this Court deems just and proper.

## <u>COUNT VI</u>
### Aiding and Abetting a Breach of Fiduciary Duty

190.    Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 136 of this Complaint as though more fully set forth herein and further allege:

191.    In furtherance of the Bongrain Conspiracy, the Bongrain Defendants held Voss out as the president and chief executive officer of Schratter to Plaintiffs and/or their principals, when, in fact, he had been stripped of his positions, duties, and powers.

192.    The Bongrain Defendants also concealed the fact that Wild had been appointed the *de facto* chief executive officer and that he ran the day-to-day affairs of Schratter and held virtually all corporate power.

193.    The Bongrain Defendants paid Voss to induce him to breach his fiduciary obligations to Plaintiffs and to Schratter

194.    The Bongrain Defendants undertook this wrongful conduct in an effort to induce Plaintiffs to place their trust and confidence in Voss, to "retain" Voss as the president and chief executive officer of Schratter, and to appoint Voss as president and a director of Atlantic Ventures. The Bongrain Defendants also paid Voss to breach his fiduciary duties as the president and chief executive officer of Schratter, as president and director of Atlantic Ventures, and as a trusted fiduciary of Plaintiffs.

195.    While Voss was a fiduciary to Plaintiffs, the Bongrain Defendants aided and abetted Voss in breaching his fiduciary duties, in breaching his duties of good faith and fair dealing, and in acting contrary to the best interests of Plaintiffs. Instead Voss acted for his own benefit and for the benefit of the Bongrain Defendants.

196.    Similarly, while Proust was a fiduciary to Atlantic Ventures, through the commitment to pay him a bonus, the Bongrain Defendants aided and abetted Proust in breaching

his fiduciary duties, breaching his duties of good faith and fair dealing, and acting contrary to the best interests of Atlantic Ventures. Instead Proust acted for his own benefit and for the benefit of the Bongrain Defendants.

197.    The Bongrain Defendants aided and abetted Voss's and Proust's breaches of fiduciary duties, duties of good faith and fair dealing, and their duties to act in the best interest of Schratter and Atlantic Ventures.

198.    As a direct and proximate result of the above-described wrongful conduct, Plaintiffs have sustained damages in an amount to be proven at trial.  The Bongrain Defendants' unlawful conduct caused special damages including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

WHEREFORE, Plaintiffs demand judgment against the Bongrain Defendants, jointly and severally, for compensatory, consequential, special, and punitive damages, together with costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT VII
### Conspiracy to Commit Breach of Fiduciary Duty

199.    Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 136 of this Complaint as though more fully set forth herein and further allege:

200.    The Bongrain Defendants entered into a conspiracy with, among others, Voss, to induce Plaintiffs to enter a fiduciary relationship with Voss.

201.    The Bongrain Defendants compensated Voss to induce him to breach the fiduciary duties he owed Plaintiffs.

202.    As a result of the wrongful conduct by the Bongrain Defendants, including as set forth in paragraphs 1 through 136 above, Plaintiffs entered a fiduciary relationship with Voss and

hired him as the president and a director of Atlantic Ventures, and "retained" him as president and chief executive officer of Schratter.

203.    The Bongrain Defendants' conspiracy with Voss to breach fiduciary duties owed by Voss to Plaintiffs began when the ECB Representatives initially placed their trust in him and continued until mid-2017.

204.    As a direct and proximate result of the above-described wrongful conduct, Plaintiffs have sustained damages in an amount to be proven at trial. The Bongrain Defendants' unlawful conduct caused special damages including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

WHEREFORE, Plaintiffs request entry of judgment against the Bongrain Defendants, jointly and severally, for compensatory, consequential, special, and punitive damages, plus costs, pre- and post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT VIII
## Conspiracy to Commit Constructive Fraud

205.    Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 136, 179 and 181 of this Complaint as though more fully set forth herein and further allege:

206.    The Bongrain Defendants conspired with Voss and others to commit a constructive fraud against Plaintiffs.

207.    The Bongrain Defendants committed multiple acts to induce Plaintiffs to enter a fiduciary relationship with Voss and to appoint him as the president and a director of Atlantic Ventures and "retain" him as the president and chief executive officer of Schratter.

208.    As part of the constructive fraud, Voss made and affirmed the misrepresentations set forth in paragraphs 179 and 191.

209.    As part of the conspiracy to commit constructive fraud, Voss used his position as a fiduciary of Plaintiffs to induce Plaintiffs to close and fund the purchase of Schratter, to loan monies to Schratter, and to fund the operations of Schratter.  Voss was also able to prevent or delay Plaintiffs from exercising remedies against the Bongrain Defendants.

210.    As part of the conspiracy to commit constructive fraud, Voss used his position as a fiduciary to improperly and fraudulently surrender rights to purchase certain products and secure certain pricing contained in the Stock Purchase Agreement without Plaintiffs' knowledge and consent.

211.    As a direct and proximate result of the above-described wrongful conduct, Plaintiffs have sustained damages in an amount to be proven at trial.  The Bongrain Defendants' unlawful conduct caused special damages including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

WHEREFORE, Plaintiffs request entry of judgment against the Bongrain Defendants, jointly and severally, for compensatory, consequential, special, and punitive damages, and such further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues triable as of right by a jury.

Respectfully submitted,
**MARKO & MAGOLNICK, P.A.**
Att*orneys for Plaintiffs*
3001 S.W. 3rd Avenue
Miami, Florida 33129
Telephone: (305) 285-2000
Facsimile:   (305) 285-5555
By: /s/   Joel S. Magolnick
**Joel S. Magolnick, Esq.**
Florida Bar No. 776068
Magolnick@mm-pa.com